# W. A. Reed, Admr. of Eliza J. Reed, Appellant, *v.* Albert L. Klaus.

[Marked to be reported.]

*Contract—Sale of real estate—Evidence—Married woman.*

In an action by a married woman to recover the price of real estate alleged to have been sold by her to defendant, it did not appear that plaintiff had ever the legal or equitable title to the property, nor did it appear that she ever had in her own name the title to a mortgage on the property. She claimed, however, that she had bought the mortgage with her own money, and that it had been assigned by the owner to another person to hold in trust for her. She averred that she had entered into an agreement with defendant that the property should be sold under foreclosure

proceedings, and that the purchase money should be paid by defendant to her. Defendant denied making such a contract or having any knowledge whatever of plaintiff's interest in the mortgage. He averred that he had bought the property from plaintiff's husband. Plaintiff's testimony on cross-examination was vague, confused and contradictory. *Held*, that the case was for the jury.

Argued Oct. 25, 1894. Appeal, No. 133, Oct. T., 1894, by plaintiff, from judgment of C. P. No. 2, Allegheny Co., Jan. T., 1889, No. 465, on a verdict for the defendant. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Assumpsit to recover purchase money of real estate alleged to have been sold by plaintiff to defendant. Before WHITE, J.

The case was originally tried in 1890, and resulted in a verdict for defendant. On appeal the judgment was reversed, and a new venire awarded: Reed v. Klaus, 152 Pa. 341.

The facts as they appeared at the second trial are stated in the opinion of the Supreme Court.

Mrs. Reed having died before the present trial, her deposition taken before the first trial was offered and received in evidence.

Defendant then offered in evidence the testimony of Klaus taken on the trial of this case in January, 1890. Plaintiff objected to any testimony as to any contract or dealings with W. A. Reed respecting the property in question, as generally incompetent and irrelevant, he being a third party and there being no evidence in the case so far and none offered, that he was either the agent of his wife in the matter or that she was present at any of the conversations or transactions with her husband. Objection overruled and exception. [1]

Defendant then offered Klaus's testimony on page 82 of the printed paper-book, as follows, referring to an indebtedness and settlement with Reed, before notice of Mrs. Reed's claim, as alleged : " Q. Just state whether at the time of that foreclosure he settled with you or gave you anything for your services ? A. You are speaking of the ten thousand dollar matter ? Q. Yes, sir. A. Well the foreclosure was made some time previous to the settlement of it ; there was a suit pending. Q. How much did that realize eventually ? A. Ten thousand

dollars; that was the Myers mortgage; April 25, 1878, was the date of it.   Q. Do you know where the money went to?· A. Yes, sir; it went to the credit of Mrs. Reed in R. Patrick & Co.   Q. Do you know where it went from there?   A. Yes, sir; it was checked out by her from R. Patrick & Co.   Q. At that time did you have a settlement with Mr. Reed for your services?  A. Yes, sir.   Q. And what did you get?   A. I got two judgment notes.   Q. What did you do with them?   A. On my visit to see him in reference to the promise of a settlement I mentioned to him the matter of allowing me to have something out of this wreck for past services, and we talked the matter over, and the conclusion of it was that he sent me by mail two judgment notes.   Q. I show you a paper and ask you if that is one of the notes?   A. Yes, sir.   Q. What was done with the other one?   A. The other one was entered up and is still on record in this county.   Q. Have these notes ever been paid?   A. No, sir." Objected to.  Objection overruled and exception. [2]

Defendant also offered the fifth, sixth and seventh questions and the answers on page 85 as follows:   " Q. And were all the transactions, about the renting of the house, with Mr. Reed? A. Yes, sir.   Q. And was the rent all paid to him?   A. Yes, sir.   Q. Ever a dollar paid to Mrs. Reed?   A. No, sir."   Objected to.   Objection overruled and exception. [3]

Plaintiff offered in evidence the testimony of Wm. A. Reed taken at the previous trial of this case, so far as it is competent in rebuttal.   The entire testimony objected to as incompetent and as not rebuttal.   Objection sustained and exception.· [4]

Plaintiff then offered in evidence the testimony of Wm. A. Reed, on page 19, appendix of the paper-book, for the purpose of contradicting defendant that he did not know the beneficial ownership of the mortgage in question was in Mrs. Reed, and for the further purpose of contradicting him as to an interview being had with Mrs. Reed in the fall of 1883, as follows: " Q. Will you state whether at any time prior to the year 1884, you had any conversation with Mr.·Klaus in reference to purchasing this property, and what that was?   A. I had; he desired to buy the property.   Q. When, first?   A. I think I was approached three or four or five times on the subject. Q. The question is when first Mr. Klaus spoke about buying

this property and what occurred ? A. I think possibly in 1882 first, or perhaps in 1883, I can't fix the exact date, but it was at her home in Montgomery county, and it was in the yard outside of the house, or rather in the rear of the house ; I know it was a pleasant day and he introduced the subject, and he says, 'that mortgage of yours is held in trust by Mr. Patrick, but it is not as secure as it ought to be ; Mr. Patrick is frequently hard up at times and quite likely you will waken up some day and find that he don't have that,' and then he proposed to buy it, said he would give five thousand dollars for it. Q. Do you know whether he saw Mrs. Reed about it ? A. Yes, sir, he saw her about the same time, on the same day either before or immediately after the conversation with me. Q. Did Mrs. Reed agree to sell the property ? A. She did ; she thought it was best to be sold. Q. Were you present when there was any agreement to sell the property ? A. Certainly." Objected to as not rebuttal and as incompetent. By the court : The first part of the offer will be admitted, down to the question beginning : " I think possibly in 1882 first, or perhaps in 1883, I can't fix the exact date." Down to that point is admitted and the other portion of the offer is refused, because it is not in rebuttal, but was what ought to have been given as evidence in chief. Exception. [5]

Plaintiff then offered in evidence the testimony of Wm. A. Reed, page 20, at the last question and answer, for the purpose of contradicting Mr. Klaus, as to the knowledge of the manner in which the mortgage was held, as follows : " Q. You can state whether, while in Pittsburg at that time, anything further was done with reference to this property, and whether you conversed further with Mr. Klaus about it ? A. I did ; I saw Mr. Patrick and explained the matter to Mr. Patrick at the request of Mr. Klaus ; of course, after having seen Mr. Patrick, and talking the matter over as to how we proposed to proceed in the matter, Mr. Klaus agreed to buy the property for five thousand dollars and have the title made through Mr. Hahn as I have already stated." Objected to, first as incompetent and irrelevant and not rebuttal, and second, as not sustaining the purpose of the offer. Objection sustained and exception. [6]

Defendant offered the testimony of Albert L. Klaus, page 91, third and fourth questions and answers, as follows, in surrebut-

tal: " Q. Was it (stock in the Fulton Mfg. works) transferred to Mr. Reed ?   A. Yes, sir ; only as we agreed upon ; our agreement in the first place.   Our agreement was in the first place that in order to save it from attaching creditors of his, I was to carry it and he to take a few shares of stock in his name to enable him under the law to act as president—to make him eligible as president.   Now at the time of the Canton Tool Co. arrangement there was a further arrangement, and it was agreed that we were to organize a new company known as the Fulton Tool Manufacturing Co., and this stock which he was to have in that was to follow the same proportion as in the Canton Co. The capital stock was to be increased to $25,000, and I was to make up in cash, or rather the cash that I was to put in to run the works was to be a credit for capital stock, and the balance was to be sold, but if we could sell the stock to any outside parties we were to sell it in order to increase its capital to $25,000.   Q. What was the object in carrying him in your name ?   A. To protect it from execution."   Objected to as not surrebuttal.   By the Court: We will admit that portion of the long answer down to the words, " to make him eligible as president," and also the last question and answer. [7].

The court charged in part as follows :

" [The contention on the part of the defendant is that he never made any contract at all with Mrs. Reed; that Mrs. Reed did not own that mortgage, but that he bought the property under an arrangement with Wm. A. Reed, the husband.   He does not claim to hold this property and not pay for it to anybody.   He admits his liability to pay Wm. A. Reed for the property.   It seems that since he got the sheriff's deed, sometime after that, he sold the property, and sold it, perhaps, at an advance over the $5,000, but he does not stand here claiming to keep this property and pay nothing for it.   Under his own testimony he would be liable to pay to Wm. A. Reed the price agreed upon, $5,000.   If the plaintiff should be defeated in this action, it does not enable him to keep that property and pay nobody for it.   Under his testimony he would be liable to pay Mr. Reed himself for it.   It has cropped out, although we have not gone very extensively into the testimony, that the defendant alleges he paid Mr. Reed a portion of the consideration money at the time, or shortly after he made the contract, and

that through dealings with Mr. Reed he would have a good defence against the whole of this purchase money. That is his position.] [8]

"I intimated to the counsel before they commenced their argument—because I frequently do that—what the rulings of the court would be, so that the counsel could address the jury in view of what the rulings of the court would be. I said to them that there were three questions in this case. [First, did Mrs. Reed own that mortgage ? If she did not, then the plaintiff cannot recover here, because the very foundation of her claim is that she owned that mortgage of $2,800 against her husband. It was on the basis, according to her own testimony, of being the owner of that mortgage—making the arrangements with the defendant for the sheriff's sale, and that finally he should get the title when he would pay the $5,000—that she brings this suit. Hence if the foundation of her whole claim falls to ruin, her claim falls.] [9] That is the first question for you to consider. She testifies that her money was invested in that mortgage of her husband. The mortgage was originally given to Heckman, who was the owner of the property and sold it to William A. Reed. I believe the mortgage was payable in three annual installments. Heckman transferred the mortgage, it seems, to a building and loan association, and it passed through two or three assignments before it was assigned to a man by the name of Handel. That was in 1875, and Mrs. Reed testifies that the money was paid to Mr. Handel; I think she said in her house, or perhaps she handed it to him, and that he was to act as her agent, for that reason the mortgage was transferred over to Mr. Handel. As I have said, that was in 1875. Two years after that, I believe in 1877, Handel transferred that mortgage to W. W. Patrick, and it stood in the name of W. W. Patrick until 1884; some time in January, I believe, or perhaps about the 1st of January, Patrick transferred the mortgage to a man by the name of Hahn, and then Hahn, under arrangements with counsel, had proceedings instituted by attorneys Miller and Erskine, when judgment was obtained against Reed, the husband, on the mortgage, and execution issued, and finally the property sold about the 1st of March of 1884. The 27th of March, 1884, I believe, is when Hahn made the title over to Klaus. [Now there was no reason why

the mortgage should not have been transferred directly to Mrs. Reed in 1875. If her money paid the person who held the mortgage at that time, there was no reason why she should not have had the mortgage transferred directly to herself. There was no illegality in that; it would have been a valid claim. Perhaps it may be said that she did not want to appear as holding the mortgage against her husband.] [10] So when Handel transferred that mortgage in 1877 to W. W. Patrick it could then have been transferred directly to Mrs. Reed, or it could have been understood that it was transferred to Patrick as trustee, but it remained in Patrick's hands until 1884, when it was transferred to Hahn, nothing then appearing on the face of the paper that it was to Hahn as trustee. Hahn testifies he did not pay Patrick for the mortgage, except $500, which money he got from Klaus, and he gave three notes of $1,000 each, nominally to pay Patrick for the transfer of the mortgage, and after the sheriff's sale these notes were handed back to him, so that in point of fact Hahn never paid one cent of his own money on the transfer of the mortgage from Patrick. The money he did pay was furnished by Klaus, and the three notes given to Patrick were, after the sale, handed back to Hahn. I cannot see why that arrangement was made, but still, if it was made there was nothing illegal in it. [I refer to these notes as bearing on the question whether this mortgage in 1884, or December, 1883, was the mortgage of Mrs. Eliza J. Reed. Was she the owner of that mortgage at that time, or was it still a claim against Wm. A. Reed? If her money was not invested in that mortgage, if she did not own that mortgage, then I say to you she cannot sustain this action, because her action is based upon the allegation that she owned the mortgage, the money was coming to her, and this arrangement with Klaus was made to secure her money—perhaps secured more. No difference about that, however. The mortgage was for $2,800. It had a great many years to run. If no interest was paid in the meantime, of course the interest would accumulate. That is the plaintiff's claim.] [11]

" Now the defendant denies that he made any contract whatever with Mrs. Reed. She said in her deposition that that contract was made in Montgomery county ; that he came there to see her and suggested to her that she had better get this mort-

gage out of Patrick's hands because he was shaky; she might wake up some morning and find the property gone, and that he would buy it and pay her $5,000 for it, and suggested this plan of a sheriff's sale by which he could get the title. [It has cropped out in the testimony that Mr. Reed himself was involved. Mr. Klaus testifies, and I believe that is not contradicted, that he could not hold property in his name, and that was the reason why he explains that he, Klaus, held an interest in the tool works in Ohio in his name, because Mr. Reed could not hold it in his own name. Of course, if the property had been sold at sheriff's sale for more than would pay off the mortgage, and it had never been transferred to Mrs. Reed, the balance would be coming to Mr. Reed, and if he was in debt, perhaps creditors might get hold of it, but Mr. Klaus says he made the arrangement directly with Mr. Reed in December, I believe, of 1883. Mr. Reed, it seems, was out of business, according to some of the testimony. He had been a prominent man in Allegheny and had gone to his wife's farm in Montgomery county.] [12]  According to Mr. Klaus's testimony, and some others, he wanted to get into some kind of business, and the son-in-law, Mr. Klaus, was willing to help him. Mr. Klaus says he made the arrangement with Mr. Reed to buy this property, and accomplished it through the same process, by having the mortgage transferred to Hahn, sheriff's sale, and then the title came to him. He denies that he ever had any conversation at all with Mrs. Reed; denies that he was in Montgomery county at the time she specifies. Patrick's bookkeeper testifies that he thinks Klaus was every day in the banking house of Patrick except some days in August. These are questions for you, because these two statements are utterly irreconcilable. [If Mrs. Reed's statement is true, then Mr. Klaus's statement is utterly untrue. If Mr. Klaus's statement is true, then Mrs. Reed's statement is utterly untrue. I cannot see how they can be reconciled. If you cannot reconcile them, then you look at all the other testimony in the case, and at the reasonableness and probability of the theories or explanations made by the different parties.] [13]  [If Mrs. Reed did not own the mortgage and she never made a sale to the defendant, of course there can be no recovery.] [14]

"[Now there might be a recovery even if Klaus did make a

contract with Reed, for at least a part of the consideration money, if, after he made the contract with Reed, he discovered that the wife claimed that she owned that mortgage, and claimed the consideration from Reed. Even admitting, for the sake of argument, that her money was in that mortgage, if Klaus did not know that fact, not being of record, and the title being in Reed, he might make the arrangement he did with Reed, and with the mortgagee, or the holder of the mortgage.] [15] If he paid Reed before he knew of her claim, he would be protected, because she, not having the mortgage assigned to her or put upon record, showing that she claimed that mortgage or had an interest in that mortgage, he would not be put on notice or inquiry, but if he got notice from her, or in any way learned that she claimed that mortgage and that it was her mortgage, and the sale being in favor of her, and for her protection and interest, then he would be bound to take notice of it, and he would not then be entitled to any credits against Wm. A. Reed after he obtained that notice.

" [But we come back almost to the original question, was the contract made with her or with Wm. A. Reed, because there is no testimony that any notice was given to Klaus of her title or her claim except her own testimony as to the contract in Montgomery county in December of 1883, until the spring of 1886. The sheriff's sale took place in March, 1886, and Klaus got title in 1886, and it seems that for two years after that she never said a word to Klaus about paying the money. That is my recollection of the testimony; if I am not correct you will take your own recollection.] [16] By Mr. Breck: The sale was in 1884. By the Court: 1884 was when the sale took place, but in the spring of 1886, she says, in the house in Allegheny, I believe, Mr. Klaus was angry at something, and complaining that there would be a settlement in the spring—he would settle in the spring, and pay her all that he owed her. True, she did not testify that he referred to this case. She says that he owed her nothing except for this, and of course she supposed he referred to this, but, according to her own testimony, nothing was said to him after he got the title, in March, 1884, until this time, the spring of 1886, two years afterwards, when this conversation took place, and when, she says, he said he would settle in the spring, and pay her all he owed her. Then

what took place after that? I do not recollect of any other claim upon Klaus by her until about the time this suit was brought, some time in 1889. I believe Klaus sold the property in 1888.

" [All of these are facts to be considered by you bearing on the plaintiff's claim, whether she was the owner of that mortgage, and whether she made the contract, as she testifies ; and the burden of proof, I may say to you, is on the plaintiff, to show her right to recover in this action."] [17]

Verdict and judgment for defendant. Plaintiff appealed.

*Errors assigned* were (1–7) rulings on evidence, quoting bills of exception ; (8–17) above instructions, quoting them ; (19) that the charge taken as a whole did not adequately present appellant's case, and misled the jury.

*Frank Whitesell,* of *Whitesell & Sons, C. C. Dickey* and *N. H. Larzelere* with him, for appellant.—On account of the identity of interest of husband and wife, when one of them is incompetent to testify as a witness the other also is incompetent: Acts of April 15, 1869, P. L. 30 ; May 23, 1887, § 5, par. *e,* P. L. 158 ; Bitner v. Boone, 128 Pa. 567.

The testimony of W. A. Reed should have been admitted to contradict appellee, on general principles : Evans v. Reed, 78 Pa. 417 ; Gregg Tp. v. Jamison, 55 Pa. 468 ; People v. Page, 1 Idaho, 189.

The term "rebutting evidence " is more particularly applied to repel the evidence given by defendant : Bouvier's L. Dict.; Fain v. Cornet, 25 Ga. 186 ; Kreiter v. Bomberger, 82 Pa. 89.

A witness may be discredited by proof that he has made different statements out of the court, from those to which he has testified : Schlater v. Winpenny, 75 Pa. 321. Any evidence which tends to impeach the credibility of a witness, is relevant : Batdorff v. Farmers' Bank, 61 Pa. 179 ; Com. v. McGowan, 2 Pars. 341.

As between the wife and any other parties, not being creditors of the husband, the presumptions of law and the rules of evidence are only ordinary, as in other cases, and she is only bound to establish her title by the ordinary degree of proof, which she did : Sawtell's Ap., 84 Pa. 310 ; John's Ap., 102

Pa. 59; Jones v. Bland, 112 Pa. 176; Earnest's Ap., 106 Pa. 310.

The case was not adequately presented to the jury and the charge was misleading and confusing in character: Rice v. Olin, Exr., 79 Pa. 391; Reed v. Klaus, 152 Pa. 341; Bisbing v. Bank, 93 Pa. 79; Norton v. Lehn, 13 W. N., p. 559; Oram v. Rothermel, 98 Pa. 300; Bughman v. Byers, 12 Atl. R. 357.

*W. B. Rodgers, E. Y. Breck* with him, for appellee.—The testimony of Klaus as to an indebtedness of and settlement with Reed, before notice of Mrs. Reed's claim, was proper: Reed v. Klaus, 152 Pa. 341.

If without notice or knowledge of Mrs. Reed's claim, Klaus paid the consideration to Reed, the owner of the property, he would be protected to the extent, but only to the extent, of the payments made before such notice or knowledge: Reed v. Klaus, 152 Pa. 341.

The portion of Reed's testimony ruled out was clearly not rebuttal.

OPINION BY MR. JUSTICE GREEN, Jan. 7, 1895:

The foundation of the plaintiff's claim in this case is an alleged contract between the plaintiff's intestate and the defendant, for the purchase by the latter of a house and lot on Chestnut street in the city of Allegheny for $5,000 to be paid in cash. The title to the property was not in the name of Mrs. Reed and never had been. On the contrary, it was in the name of her husband, who originally purchased it, and she never held it by any deed, conveyance, gift or any other species of title. She was not, and did not claim to be, even the equitable owner of it. On the contrary her husband had given a mortgage on the property for $2,800, to one Heckman and wife, dated October 3, 1872, and it was claimed that this mortgage had passed by various assignments to a number of different persons, until; on April 28, 1877, it was transferred to W. W. Patrick, who, on January 3, 1884, transferred it to Leonard Hahn, a brother-in-law of Klaus, the defendant. It never was transferred to Mrs. Reed. She alleges however that she furnished the money to pay off the mortgage to one Handel, who held it from August 27, 1875, to April 28, 1877, and that the transfer from Han-

del to Patrick was really made for her benefit, he holding it as trustee for her. If she had been the real owner of the property, or had held the title in her own name, an inquiry into the source of her title would have been of little, if any, consequence, as this was a contest between her and an alleged purchaser from her, not involving the rights of her husband's creditors. But as the defendant denied utterly and absolutely any contract with her, or even any conversation with her respecting a purchase of the property, it became a matter of serious consequence to her to prove that she was, at least, the equitable owner of the mortgage held by Patrick, in order to give some color to her claim to have the proceeds of the sale to Klaus. There was a sale made to Klaus. It was by a deed made by Hahn, the last transferee of the mortgage, and the method by which the change of title from Mrs. Reed's husband to Klaus was brought about, was a scire facias on the mortgage by Hahn, a consequent judgment, execution and sheriff's sale of the property to Hahn who bought it at the sale, and then a deed from Hahn to Klaus. To this arrangement both Reed and his wife were manifestly consenting parties. The only money that was paid was a sum of five hundred dollars which Hahn paid to Patrick for the transfer of the mortgage to Hahn, which money Hahn testifies was paid to him by Klaus, and the costs and expenses of the proceeding under the mortgage and the sheriff's sale, and that money also was paid by Klaus. The preliminary arrangements for the change of title to the land were made, according to Hahn's testimony, between Klaus, William A. Reed, Hahn and Mr. Erskine, a member of the bar who conducted the proceedings at the direct instance of Klaus. The nominal purchase money at the sheriff's sale was five hundred dollars, of which no part was paid except a sum sufficient to defray the costs and expenses, and that was paid by Klaus.

The aspect of the contention now becomes visible. Klaus testifies that all his dealings were with the husband in whose name the title to the property stood; that he agreed to buy the property from Reed in consideration of a transfer by him to Reed of an interest in a manufacturing company located at a place called Canal Fulton in the state of Ohio. Mr. Klaus thus states his agreement with Reed : " He agreed to make title to this house, that is, I agreed to give him an interest of a third in

the manufactory, and he was to give me title to the house, and I was to account for five thousand dollars and he was to account for whatever the interest was worth in those works." Klaus said he not only did not know, and was never informed, that Mrs. Reed claimed any interest or title in the property, but also that he had no knowledge of her claiming any interest in the mortgage.

The testimony of Mrs. Reed, taken by deposition, was read at the trial and she testified fully to a contract made with Klaus, that he would buy the property from her for $5,000 in cash. Of course, as she had no title, the ownership of the mortgage, through the use of which the change of title was effected, became a most serious element in the contention. She gave testimony on that subject at considerable length, claiming that her money was paid to Handel for it, but when she was cross-examined her testimony became quite confusing, and to a considerable extent contradictory. She at first said she thought she handed the money to Handel who she said was her agent. Afterwards she said she could not tell whether she handed it to Handel or got Mr. Reed to do so. She said at first it was paid by her own check, and afterwards that part of it was paid in cash, and part by check. But she could not tell on what bank the check was drawn nor for how much, nor could she give any particulars in regard to it. No actual check of hers was given in evidence nor any bank account showing any such payment. Mr. Patrick was not examined nor Mr. Handel, and altogether her testimony on this subject was of a very unsatisfactory character. She said Klaus was present at one of the payments, but Klaus denied it most positively as he did the whole of her story in regard to any contract with her for the purchase of the property. It is not necessary to pursue these details. They extended quite widely. We have only referred to enough of them to show that two important questions of fact were developed on the trial, one, the ownership of the mortgage, the other the making of a contract with Klaus. Neither could be taken from the jury. A favorable finding of both was essential to the plaintiff's case. The verdict depended almost exclusively upon the credibility of witnesses and the probability of Mrs. Reed's statement as to her ownership of the mortgage. Its truthfulness was a fair subject of controversy before the jury. After a most careful study

of the charge of the learned judge of the court below, and a patient reading of the whole of the testimony, we are convinced of its fairness, its sufficiency as a presentation of the whole subject, and its strict legal correctness. The case was carefully tried in accordance with the former opinion of this court, and we are constrained to add that we regard the verdict as a reasonable and just conclusion from the whole of the evidence. The authorities and principles invoked for the appellant are inapplicable. They do not reach the heart of the controversy. They are perfectly correct but they do not embrace the questions at stake here.

Without going through the remaining assignments of error in detail we are clearly of opinion that none of them is sustained and they are all dismissed.

Judgment affirmed.